Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 25, 2018

**2018 CO 63**

**No. 17SA55, <u>Coors Brewing Co. v. City of Golden</u>—Augmentation Plans—
Amendment of Augmentation Plans—Return Flows.**

This case concerns Appellant's application to amend its decreed augmentation
plans to authorize the reuse and successive use of return flows from water that
Appellant diverts out of priority pursuant to those plans.  On competing motions for
determinations of questions of law, the water court ruled that (1) any amount of water
not beneficially used by Appellant for the uses specified in its decreed augmentation
plans must be returned to the stream; (2) Appellant's decreed augmentation plans did
not authorize the reuse or successive use of such water; and (3) Appellant may not
obtain the right to reuse or make successive use of such water by way of amendment to
its augmentation plans but could only obtain such rights by adjudicating a new water
right.

The supreme court now affirms.  Like the water court, the court concludes that in
order to obtain the right to reuse and make successive use of the return flows at issue,
Appellant must adjudicate a new water right and may not circumvent this requirement
by amending its decreed augmentation plans.  The court further concludes that the

diversion of native, tributary water under an augmentation plan does not change its character. Accordingly, the general rule, which provides that return flows belong to the stream, applies. Finally, the court concludes that the water court correctly construed Appellant's augmentation plans.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

### 2018 CO 63

---

### Supreme Court Case No. 17SA55
*Appeal from the District Court*
Weld County District Court, Water Division 1, Case No. 15CW3179
Honorable James F. Hartmann, Water Judge

---

Concerning the Application for Amendment to Plans for Augmentation of Coors Brewing Company, in Jefferson, Adams, and Weld Counties.

### Applicant-Appellant:

Coors Brewing Company,

and

### Opposer-Appellant:

City of Thornton,

v.

### Opposers-Appellees:

City of Golden, Centennial Water and Sanitation District, City and County of Denver, City of Arvada, City of Black Hawk, City of Northglenn, City of Westminster, Climax Molybdenum Company, Farmers High Line Canal and Reservoir Co., FRICO, Public Service Company of Colorado, State and Division Engineers, and Town of Georgetown.

---

### Judgment Affirmed
*en banc*
June 25, 2018

---

**Attorneys for Applicant-Appellant:**
Burns, Figa & Will, P.C.

Stephen H. Leonhardt
Courtney M. Shephard
Morgan L. Figuers
*Greenwood Village, Colorado*

Naomi M. Baez Amos
*Denver, Colorado*

**Attorneys for Opposer-Appellant:**
Hoskin Farina & Kampf, Professional Corporation
William A. Hillhouse II
John P. Justus
*Grand Junction, Colorado*

**Attorneys for Opposer-Appellee City of Golden:**
Porzak Browning & Bushong LLP
Glenn E. Porzak
Steven J. Bushong
*Boulder, Colorado*

**Attorneys for Opposer-Appellee City of Arvada:**
Lyons Gaddis Kahn Hall Jeffers Dworak & Grant PC
Steven P. Jeffers
Madoline Wallace-Gross
*Louisville, Colorado*

**Attorneys for Opposer-Appellee City of Westminster:**
Carlson, Hammond & Paddock, LLC
Lee H. Johnson
Mason H. Brown
*Denver, Colorado*

**Attorneys for Opposer-Appellee State and Division Engineers:**
Cynthia H. Coffman, Attorney General
Paul L. Benington, First Assistant Attorney General
Jeffrey N. Candrian, Assistant Attorney General
*Denver, Colorado*

**Attorneys for Amicus Curiae Central Colorado Water Conservancy District:**
Lawrence Jones Custer Grasmick, LLP
Bradley C. Grasmick
Wesley S. Knoll
*Johnstown, Colorado*

**Attorneys for Amicus Curiae Consolidated Mutual Water Company:**
Collins Cockrel & Cole, P.C.
Evan D. Ela
Joseph W. Norris
*Denver, Colorado*

**Attorneys for Amici Curiae Todd Creek Village Metropolitan District and Martin Marietta Materials, Inc.:**
Brownstein Hyatt Farber Schreck, LLP
Wayne F. Forman
*Denver, Colorado*

No appearance by or on behalf of Centennial Water and Sanitation District, City and County of Denver, City of Black Hawk, City of Northglenn, Climax Molybdenum Company, Farmers High Line Canal and Reservoir Co., FRICO, Public Service Company of Colorado, or Town of Georgetown.

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE BOATRIGHT** does not participate.

¶1     This case concerns Coors Brewing Company's application to amend its decreed augmentation plans to authorize the reuse and successive use of return flows from water that Coors diverts out of priority pursuant to those plans. The City of Golden opposed this application, arguing that Coors could not proceed by amendment but must adjudicate a new water right to reuse or make successive use of the return flows. On competing motions for determinations of questions of law, the water court ruled that (1) any amount of water not beneficially used by Coors for the uses specified in its decreed augmentation plans must be returned to the stream; (2) Coors's decreed augmentation plans did not authorize the reuse or successive use of such water; and (3) Coors may not obtain the right to reuse or make successive use of such water by way of amendment to its augmentation plans but could only obtain such rights by adjudicating a new water right.

¶2     Coors appeals, arguing that the water court erred in (1) holding that Coors may not proceed by amendment but must adjudicate a new water right; (2) concluding that water unconsumed by Coors's initial use must be returned to the stream and is subject to appropriation by other water users; and (3) interpreting Coors's augmentation plan decrees to require permanent dedication of return flows to the stream.

¶3     We now affirm. Like the water court, we conclude that in order to obtain the right to reuse and make successive use of the return flows at issue, Coors must adjudicate a new water right and may not circumvent this requirement by amending its decreed augmentation plans. We further conclude that the diversion of native, tributary water under an augmentation plan does not change its character.

4

Accordingly, the general rule, which provides that return flows belong to the stream, applies. Finally, we conclude that the water court correctly construed Coors's augmentation plans.

## I. Facts and Procedural History

¶4 Between 1977 and 2007, Coors sought and obtained three augmentation plan decrees. These decrees allowed Coors to divert water from Clear Creek out of priority for use within Coors's Golden brewery and industrial complex, conditioned on Coors's releasing enough replacement water to avoid injury to senior rights. Much of the water that Coors diverts pursuant to the decreed augmentation plans is consumed by Coors's brewery operations. Water not consumed by the brewery is run through Coors's wastewater treatment plant and is then delivered to Clear Creek.

¶5 Beginning in the 1970s, Coors, with the approval and oversight of the State and Division Engineers, maintained a program to lease the water delivered to Clear Creek (the "return flows") to other water users. Coors apparently operated this program with the understanding that once it fully replaced its out-of-priority diversions, it had no further obligation under its augmentation decrees because Clear Creek would have been made whole (i.e., Clear Creek would then have contained the same amount of water at the replacement water delivery point as it would have had without Coors's diversions). Coors further understood that at this point, any "excess" water released from Coors's wastewater treatment plant would have served only to overcompensate the stream, and Coors believed that it could reuse or lease such water to other users downstream.

5

¶6    In 2014, however, the State Engineer chose not to approve a new lease of Coors's return flows to Martin Marietta Materials, Inc., effectively terminating Coors's long-time leasing practice. Coors and Martin Marietta challenged the Engineer's decision before the water court, arguing that the return flows at issue could be reused or successively used by Coors, as it had done for many years. The Engineer disagreed, arguing that Coors's augmentation plans did not specify that Coors could reuse or successively use its return flows. The parties then filed cross-motions for determinations of questions of law.

¶7    The water court ultimately agreed with the State Engineer. The court began by noting that Coors's decreed augmentation plans allowed only a single use of the water diverted by Coors, and this use was limited to the purposes specified in the decrees. Because the plans did not authorize the reuse or successive use of such water, the court found that Coors was required to return unconsumed native water from Coors's initial use back to the stream and could not lease the return flows absent a subsequent decree authorizing the reuse or successive use of that water.

¶8    In reaching this conclusion, the court rejected Coors's contention that native water withdrawn from a stream that is fully replaced under an augmentation plan is like developed, foreign, or non-tributary water and thus could be fully consumed, reused, or successively used. The court observed that the fact that Coors diverts native, tributary water out of priority by adding replacement water to the stream under its decreed augmentation plans does not change the character of the water that is diverted from native water to something akin to foreign, developed, or non-tributary water. In

6

the court's view, Coors therefore could not apply the water at issue to uses beyond those specified in its decrees, and the reuse or successive use that Coors sought was not so specified.

¶9    The court further rejected Coors's argument that other users had no expectation of return flows from fully augmented diversions and therefore the one-use rule need not apply. The water court opined that this court had addressed and rejected a similar argument in Water Supply and Storage Co. v. Curtis, 733 P.2d 680 (Colo. 1987). There, the applicant argued that an original appropriator should be recognized to have the right to reuse and make successive uses of water if the further use of the water was initiated immediately after the first beneficial use so that other users had no expectations regarding, and did not come to rely on, the return flows. Id. at 682–83. This court disagreed, observing first that once the beneficial use on which a water right is based has taken place, any unconsumed waters remain waters of the state and were subject to appropriation. Id. at 683. We then noted that the proper inquiry was whether the applicant had established by appropriation a right in the return flows. Id. On the facts there before us, we concluded that the applicant had not done so. Id.

¶10    The water court in the present case determined that the same principles apply here. Coors's augmentation plan decrees provide that after Coors's initial use, any unconsumed water must be returned to the stream. The decrees do not authorize reuse or successive use. Thus, as in Water Supply, the unconsumed water remains waters of the state.

7

¶11 Upon receiving the water court's ruling, Coors filed a motion for leave to amend its existing augmentation plan decrees to allow the reuse or successive use of the return flows at issue. Golden moved to dismiss Coors's application, and the parties filed cross-motions for determinations of questions of law. The water court ultimately sided with Golden, concluding, "Coors may not obtain the right to reuse return flows through an amendment to its decreed augmentation plans, but instead may only obtain the right to reuse return flows by adjudicating a new water right."

¶12 In reaching this conclusion, the court reiterated the fundamental rule that water native to the stream system is limited to one use and that any return flows belong to the stream, subject to appropriation and administration. In the court's view, any reuse of return flows without a decree authorizing such use would amount to an unlawful enlargement of an appropriation by Coors. The court thus determined that to reuse return flows from a decreed use of native water, an appropriator must establish all of the elements of an independent appropriation and obtain a decree as a separate water right.

¶13 Turning to the facts before it, the court found that none of Coors's decreed augmentation plans authorize the reuse or successive use of return flows. To the contrary, each decree provides that any amount of water not consumed during Coors's initial use of the water must be returned to the stream. Because Coors had neither claimed nor proved when it originally litigated its augmentation plan decrees that it would place return flows to beneficial use, the court concluded that Coors could not proceed by way of an amendment to its augmentation plan. To allow Coors to do so,

8

the court observed, would result in return flows that had historically accumulated and belonged to the stream being "precipitously" removed from the priority system.

¶14 After receiving this order from the water court, Coors advised the court that it would not seek a new appropriation but rather would pursue its effort to amend its augmentation decrees. The court then certified its order as final pursuant to C.R.C.P. 54(b), and Coors now appeals.

## II. Analysis

¶15 Coors raises three issues in this appeal. First, it contends that the water court erred in concluding that Coors may not obtain rights of reuse or successive use by amending its augmentation plan decrees but rather must adjudicate a new water right. Second, it argues that the water court erred in concluding that the return flows at issue are subject to appropriation by other water users. In Coors's view, the return flows at issue are akin to foreign or developed water and thus Coors has an implied right of reuse. Finally, Coors argues that the water court erred in interpreting Coors's augmentation plan decrees to require permanent dedication of return flows to the stream, regardless of whether such return flows are needed to replace Coors's fully augmented depletions.

¶16 After briefly summarizing the pertinent principles of water law at issue, we address and reject each of Coors's arguments in turn.

## A. Prior Appropriation and Augmentation Plans

¶17 The prior appropriation doctrine is embedded in the Colorado Constitution and forms the foundation of Colorado water law. City of Boulder v. Boulder & Weld Cty.

9

Ditch Co., 2016 CO 17, ¶ 26, 367 P.3d 1179, 1186. In accordance with the prior appropriation doctrine, Colorado water law reflects a property rights-based allocation and administration system that promotes multiple use of a finite resource for beneficial purposes. Id. Under this system, "[t]he first user to place previously unappropriated water to beneficial use enjoy[s] a vested water right in the beneficial use of that water, thus giving that senior appropriator priority in use over all subsequent (and therefore junior) appropriators." Gallegos v. Colo. Ground Water Comm'n, 147 P.3d 20, 27 (Colo. 2006). In this system, water rights are created by appropriation, confirmed and assigned priority dates through adjudication, and enforced according to those priority dates through administration. City of Boulder, ¶ 26, 367 P.3d at 1186.

¶18 Notably, a water right is a usufructuary right that gives its holder "the right to use and enjoy the property of another without impairing its substance." Navajo Dev. Co. v. Sanderson, 655 P.2d 1374, 1377 (Colo. 1982). Thus, one does not "own" water, but rather he or she owns the right to use water within the limitations of the prior appropriation doctrine. Kobobel v. Colo. Dep't of Nat. Res., 249 P.3d 1127, 1134 (Colo. 2011).

¶19 Given the demand for water and its scarcity as a resource, the adequacy of the supply of water to satisfy all claims can never be guaranteed. See id. at 1134–35. Indeed, as a result of increasing demand, by the 1960s, many of Colorado's river systems were reaching overappropriated status. See City of Boulder, ¶ 27, 367 P.3d at 1186. In response to this issue, new water uses developed, and the legislature ultimately saw value in facilitating such uses, while at the same time protecting vested

10

water rights. Id. at ¶ 28, 367 P.3d at 1186. Accordingly, as pertinent here, the legislature created several mechanisms "designed to facilitate new uses of overappropriated water resources." Id. A plan for augmentation is one of these statutory mechanisms, id. at ¶ 29, 367 P.3d at 1186, and in creating this mechanism, "[t]he General Assembly chose to implement a policy of maximum flexibility that also protected the constitutional doctrine of prior appropriation," Empire Lodge Homeowners' Ass'n v. Moyer, 39 P.3d 1139, 1150 (Colo. 2001).

¶20 A plan for augmentation is

> a detailed program, which may be either temporary or perpetual in duration, to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means.

§ 37-92-103(9), C.R.S. (2017).

¶21 When decreed by the water court, an augmentation plan allows a junior appropriator to divert out of priority if adequate replacement water is supplied so as to prevent injury to senior rights. See Simpson v. Bijou Irrigation Co., 69 P.3d 50, 60–61 (Colo. 2003). To satisfy this condition, "[j]unior appropriators typically provide an augmented water supply to offset their out-of-priority depletions so that holders of decreed water rights can enjoy the quantity of supply that would be available to them absent those depletions." City of Thornton v. City & Cty. of Denver ex rel. Bd. of Water Comm'rs, 44 P.3d 1019, 1025 (Colo. 2002).

11

¶22    An applicant for an augmentation plan must receive judicial approval for that plan. San Antonio, Los Pinos & Conejos River Acequia Pres. Ass'n v. Special Improvement Dist. No. 1, 270 P.3d 927, 937 (Colo. 2011); see also § 37-92-302(1)(a), C.R.S. (2017) (requiring a person who desires approval of a plan for augmentation to file with the water clerk a verified application setting forth the facts supporting the ruling sought).

¶23    The standards for judicial approval of augmentation plans appear in subsections 37-92-305(3), (5), and (8), C.R.S. (2017). We have summarized these standards as follows:

> Subsection (3)(a) states that a plan for augmentation "shall be approved if such . . . plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." Subsection (5) states, "In the case of plans for augmentation . . . , the supplier may take an equivalent amount of water at his point of diversion or storage if such water is available without impairing the rights of others." Subsection (8)(a) requires the water court, "in reviewing a proposed plan for augmentation and in considering terms and conditions that may be necessary to avoid injury," to consider "the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water that would be provided by the applicant, and the existence, if any, of injury" to any person entitled to use water under a vested water right or a decreed conditional water right. Subsection (8)(c) states "a plan for augmentation shall be sufficient [if] . . . the applicant . . . provide[s] replacement water" to the extent "the senior would be deprived of his or her lawful entitlement" of water. Subsection (8)(c) also requires the terms and conditions of the augmentation plan to require replacement of "out-of-priority depletions that occur after any ground water diversions cease."

Well Augmentation Subdist. of Cent. Colo. Water Conservancy Dist. v. City of Aurora, 221 P.3d 399, 410 (Colo. 2009); see also Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co., 195 P.3d 674, 684 (Colo. 2008) ("The augmentation plan must identify the

diversion structures, the uses to be augmented, and the source and amount of legally available replacement water to replace the depletions.").

¶24 Having thus described the nature of the rights at issue here, we proceed to address Coors's contentions on appeal.

## B. Amendment of Coors's Augmentation Plans

¶25 Coors principally contends that the water court erred in concluding that Coors may not amend its augmentation plan decrees to add rights of reuse or successive use but instead must seek a new appropriation.[1] For several reasons, we are not persuaded by Coors's argument.

¶26 First, as Golden observes, the only amendments to augmentation plans that the pertinent statute appears to contemplate are amendments to allow "additional or alternative sources of replacement water," if the augmentation plan provides a procedure for seeking such changes. § 37-92-305(8)(c), C.R.S. (2017). Accordingly, it is not at all clear that the statute authorizes amendments of the type that Coors is pursuing in this case.

---

[1] This court has had few opportunities to consider the standards applicable to amending an augmentation plan, although we have observed that the legislature has recognized "the complex nature of a plan for augmentation and the necessity of allowing the water court to adjust such a plan upon reconsideration." Crystal Lakes Water & Sewer Ass'n v. Backlund, 908 P.2d 534, 542 (Colo. 1996). We need not attempt to delineate any applicable standards here, however, because we conclude that the procedure for amending an augmentation plan must, at a minimum, comply with the requirements of both subsections 37-92-305(3), (5), and (8) and our case precedents. As more fully discussed below, Coors has not established such compliance here.

13

¶27    Second, a long line of case law from this court makes clear that "[i]n order to reuse or make successive use of return flows, all of the elements of an independent appropriation must be established and decreed as a separate water right."  Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson, 990 P.2d 46, 54 (Colo. 1999); accord City of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 65 (Colo. 1996); Water Supply & Storage Co., 733 P.2d at 682–83.

¶28    Here, although certain decrees that Coors has adjudicated have allowed reuse and successive use, the decreed augmentation plans at issue have not.  Thus, Coors has not yet adjudicated the rights of reuse and successive use that it seeks here, and settled case law requires such an adjudication.

¶29    In this regard, we are unpersuaded by Coors's contention that it need not adjudicate a right to reuse or make successive use of the return flows at issue because it diverted the water under an augmentation plan.  As the water court observed, diverting water out of priority from the public stream system and replacing water under a decreed augmentation plan does not allow a junior water user to circumvent the established rule that an appropriation is limited to the amount of water the appropriator puts to beneficial use, with the beneficial uses being those set forth in the decreed augmentation plans.  See Burlington Ditch Reservoir & Land Co. v. Metro Wastewater Reclamation Dist., 256 P.3d 645, 663 (Colo. 2011) ("Water native to the stream system is limited to one use in that system and return flows belong to the stream system as part of the public's resource, subject to appropriation and administration."); Water Supply & Storage Co., 733 P.2d at 683 ("[T]he proper inquiry is whether the

14

applicant has established a right in the return flow by appropriation, for that is the basis, if there is any, upon which its claim to that return flow must be founded."). Coors cites no applicable authority to support its view that different principles apply to augmentation plan decrees than apply to other decreed water rights, and we have seen no such authority.

¶30 Third, what Coors construes as a "limited" amendment to its decreed augmentation plans would effectively add new uses to its decreed water rights while avoiding the procedural hurdles that normally accompany such changes. Specifically, Coors contends that the water court <u>must</u> approve the amendment allowing reuse and leasing after a showing of non-injury. As Golden noted at oral argument, however, such an abbreviated proceeding would seem to preclude a party opposing such an amendment from challenging the amendment under, among other things, the anti-speculation doctrine, which the party could indisputably do if Coors were to seek a new appropriation. <u>See</u> <u>Front Range Res., LLC v. Colo. Ground Water Comm'n</u>, 2018 CO 25, ¶ 27, 415 P.3d 807, 812 (noting that the anti-speculation doctrine applied to the replacement plan there at issue because that plan involved new appropriations or changes of water rights of designated groundwater).

¶31 Finally, we disagree that the State Engineer's prior approval of Coors's practice of leasing return flows has any bearing on our decision today. "Administrative action, forbearance of enforcement, or State Engineer acquiescence in water use practices does not substitute for judicial determination of use rights." <u>Empire Lodge</u>, 39 P.3d at 1156–57. Whether or not the State Engineer's decision in 2014 effected a change in

15

policy, Coors's historical practice of leasing return flows does not justify a continuation or, indeed, expansion of that practice.

¶32 For these reasons, we agree with the water court that Coors must establish all of the elements of an independent appropriation to obtain the right to reuse or make successive use of return flows generated after its initial use of the water at issue.

¶33 In reaching this conclusion, we are unpersuaded by Coors's contention that requiring it to establish the elements of an independent appropriation defeats the purpose of the statutory scheme. Although augmentation plans implement the General Assembly's policy of "maximum flexibility" for water users, they do so by protecting, not subverting, the prior appropriation doctrine. See id. at 1150. Here, each of Coors's three augmentation plans appears to have sought and achieved the legislature's intended flexibility by allowing Coors to divert water out of priority for use within its brewery and industrial complex, when Coors's junior water rights might otherwise have been curtailed. We perceive nothing in the statutory scheme that contemplates, much less sanctions, a water user's diverting water out of priority, overcompensating the stream for the depletions caused by its out-of-priority diversions, applying the diverted water to a beneficial use, and then seeking to lease any excess water to users downstream. To the contrary, such a practice conflicts with the fundamental principle that appropriators are limited to a single beneficial use and that return flows belong to the stream system as part of the public's resources, subject to appropriation and administration. See Burlington Ditch, 256 P.3d at 663.

16

## C. Return Flows Subject to Appropriation

¶34 Coors next contends that the water court erred in concluding that its return flows are subject to appropriation by other water users. In Coors's view, water that it diverts and fully replaces under its decreed augmentation plans is akin to foreign and developed water. This is so, Coors argues, because the act of delivering replacement water to compensate (and sometimes overcompensate) the stream for its depletions maintains or even increases the supply of water available for beneficial use in the stream. Thus, Coors suggests that it should have an implied right to reuse and make successive use of such water, which should not be available for appropriation by other users. We disagree.

¶35 Notwithstanding Coors's suggestion to the contrary, water that Coors diverts from Clear Creek is native, tributary water, that is, "waters of the state." § 37-92-103(12) ("'Waters of the state' means all surface and underground water in or tributary to all natural streams within the state of Colorado, except waters referred to in section 37-90-103(6)."). Foreign and developed waters, in contrast, are not native, tributary waters. See City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r, 105 P.3d 595, 603 n.3 (Colo. 2005) ("Developed water is water that was not previously part of the river system and thus is not subject to administration by the state engineer."); City of Thornton, 926 P.2d at 66 (defining "foreign water" as "water that is brought into a watershed or stream system from a source unconnected with the receiving system").

¶36 A user that imports foreign or developed water into a stream system has imported new water from an unconnected source and for that reason is deemed to have

17

an inherent right of reuse or successive use. See § 37-82-106(1), C.R.S. (2017) ("Whenever an appropriator has lawfully introduced foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of such water by exchange or otherwise . . . ."); cf. Williams v. Midway Ranches Prop. Owners Ass'n, 938 P.2d 515, 523 (Colo. 1997) ("In contrast to developed or imported water which is foreign to the tributary supply and typically can be utilized to extinction, an appropriation of tributary water cannot serve an enlarged duty, in the absence of noticed intent to appropriate for reuse or successive uses.") (citation omitted).

¶37     In contrast, Coors, which diverts native, tributary water pursuant to a decreed augmentation plan, has not imported new water from an unconnected source into the stream system. And contrary to Coors's suggestion, the mere act of diverting and fully replacing water under an augmentation plan does not effectively change the character of the diverted water as native, tributary water. Accordingly, the diversion and replacement of water under an augmentation plan does not confer on Coors an automatic right of reuse. See City of Thornton, 926 P.2d at 65 ("Appropriators of water native to a public stream have no automatic right to capture and reuse this water after the initial application to beneficial use."); Water Supply & Storage Co., 733 P.2d at 683 (noting that once the beneficial use on which a water right is based has taken place, any unconsumed waters remain waters of the state and are therefore subject to appropriation). Rather, like all native, tributary water, absent decreed rights of reuse or

18

successive use, the water that Coors diverts may be used once, and unconsumed water must be returned to the stream, where it is subject to appropriation by other users.

¶38   In reaching this conclusion, we are not persuaded by Coors's contention that our conclusion undermines augmentation plans' statutory purposes. Specifically, Coors contends that requiring it both to replace depletions under its augmentation plans and to relinquish the return flows at issue would deter the use of augmentation plans, destabilize the value of augmentation decrees, and undermine the maximum beneficial use of water. For two reasons, we disagree.

¶39   First, we note that Coors's augmentation plan decrees allow Coors to reduce its replacement obligations by the amount of return flows generated and returned to Clear Creek at specified points. Thus, Coors need not overcompensate the stream, and it does not do so when it uses its return flows to offset depletions.

¶40   Second, the fact that Coors's replacement of depletions and relinquishment of return flows may sometimes result in overcompensation and a net gain to the stream is simply part of the normal functioning of augmentation plans. As this court has observed:

> [A]ugmentation plans are often fashioned, or operate by default, to supply more augmentation water to the stream than proves to be necessary. Supplying excess augmentation water to the stream under a decree certainly benefits other water users in order of their priorities, but there is no entitlement to continuation of such a gratuity.

Wolfe v. Sedalia Water & Sanitation Dist., 2015 CO 8, ¶ 34, 343 P.3d 16, 28.

¶41   In sum, Coors need not overcompensate the stream, and the fact that it may sometimes do so does not undermine either the purpose of augmentation plans or the

19

maximum beneficial use of water. Rather, occasional overcompensation appears to be a by-product of the legislature's policy of maximizing flexibility while, at the same time, protecting the prior appropriation doctrine by ensuring that out-of-priority diverters deliver at least enough replacement water to compensate the stream. See Empire Lodge, 39 P.3d at 1150.

## D. Interpretation of Coors's Augmentation Plans

¶42 Finally, Coors contends that the water court erred in concluding that Coors's decrees require it to dedicate return flows to the stream, regardless of whether such return flows were needed to replace depletions caused by Coors's out-of-priority diversions. Again, we are not persuaded.

¶43 Each of the three decrees at issue expressly provides that Coors will return all unconsumed water back to the stream. Specifically, two of the decrees provide, "[A]fter use, the portion of the water not consumed within [Coors's] industrial complex is measured . . . and returned to the Clear Creek-South Platte stream systems at various of [specified] locations." The third decree likewise provides, "[A]fter use, the portion of the water not consumed is measured . . . and returned to the Clear Creek-South Platte stream systems at various of [specified] locations." Although Coors appears to assert that these provisions serve only to indicate where it may release return flows, in our view, such an interpretation reads out of the decrees the express requirement that unconsumed water be returned to the stream system. Accordingly, the water court's findings are supported by the plain language of the decreed augmentation plans.

¶44 Moreover, as noted above, in concluding that return flows from Coors's initial use of water belong to the stream, the water court relied on "the established <u>legal principle</u> that native water is limited to a single use and all unused water must be returned to the stream, where it then becomes available for appropriation by other water users." (Emphasis added.) Thus, the water court's conclusion is also supported by long-settled law.

¶45 We therefore conclude that the water court did not err in its construction of Coors's augmentation plans.

## III. Conclusion

¶46 For these reasons, we conclude that (1) in order to obtain the right to reuse or make successive use of the return flows at issue, Coors must adjudicate a new water right and may not proceed by way of an amendment to its decreed augmentation plans; (2) water unconsumed by Coors's initial use must be returned to the stream and is subject to appropriation by other water users; and (3) the water court correctly interpreted Coors's decreed augmentation plans. Accordingly, we affirm the water court's judgment and remand this case for further proceedings consistent with this opinion.