1
 2025 CO 5
Concerning the Application for Amendment of an Augmentation Plan of Independence Water and Sanitation District in Elbert County. Franktown Citizens Coalition II, Inc. and West Elbert County Well Users Association, Opposers-Appellants v. Independence Water and Sanitation District, Applicant-Appellee and Division 1 Engineer. Appellee Pursuant to C.A.R. 1(e) No. 23SA154
Supreme Court of Colorado, En Banc
February 10, 2025

 Appeal
 from the District Court District Court, Water Division 1,
 Case No. 19CW3220 Honorable Todd L. Taylor, Water Judge

 Attorneys for Opposers-Appellants: Monson, Cummins, Shohet
 & Farr, LLC David M. Shohet Colorado Springs, Colorado

 Attorneys for Applicant-Appellee: Hayes Poznanovic Korver LLC
David S. Hayes Matthew S. Poznanovic Eric K. Trout
 Denver, Colorado

 No
 appearance on behalf of: Division 1 Engineer.

 CHIEF
 JUSTICE MARQUEZ delivered the Opinion of the Court, in which
 JUSTICE BOATRIGHT, JUSTICE HOOD, JUSTICE HART, JUSTICE
 SAMOUR, and JUSTICE BERKENKOTTER joined.

 MÁRQUEZ CHIEF JUSTICE

 ¶1
Independence Water and Sanitation District
("Independence"), a quasimunicipal special
 district, intends to provide water services to a proposed
 920-home residential development located on a 1,012-acre
 property in Elbert County, Colorado (the "Subject
 Property"). To do so, it will withdraw groundwater
 underlying the Subject Property from the Denver
 Basin[1] pursuant to a 2006 decree. See
 generally In re Application for Water Rts. &an
 Augmentation Plan of Grant Bentley in Elbert Cnty., No.
 06CW59 (Dist. Ct., Water Div. 1, Sept. 5, 2006) (Findings of
 Fact, Conclusions of Law, Ruling of the Referee, Judgment and
 Decree, in the Nontributary Lower Dawson, Denver, Arapahoe,
 and Laramie-Fox Hills and the Not Nontributary Upper Dawson
 Aquifers) ("2006 Decree"). The 2006 Decree
 established the amounts of nontributary and not-nontributary
 groundwater[2]

 available for withdrawal from the Denver Basin's four
 aquifers and identified a host of uses for the water.
Id. at 2. It also approved an augmentation plan
 permitting the use of a portion of the decreed
 not-nontributary groundwater from the Upper Dawson aquifer
 for two of those uses on the Subject Property. Id.
 at 4. This case concerns Independence's application to
 amend the augmentation plan in the 2006 Decree to permit the
 specified portion of not-nontributary groundwater to be used
 for all of Independence's decreed uses (plus
 municipal use) and to allow such uses both on and off the
 Subject Property.

 ¶2
 Independence's application encountered considerable
 opposition before the Division 1 water court. As relevant
 here, Franktown Citizens Coalition II, Inc.
("Franktown") and West Elbert County Well Users
 Association (collectively, "Opposers") moved for
 summary judgment, arguing that the water court could

 not approve Independence's application to amend its
 augmentation plan because it could not make the threshold
 showing of non-speculative intent required by the
 anti-speculation doctrine. The anti-speculation doctrine is a
 well-established principle of Colorado water law that
 "precludes the appropriator who does not intend to put
 water to use for [their] own benefit, and has no contractual
 or agency relationship with one who does, from obtaining a
 water use right." Colo. Ground Water Comm'n v.
 N. Kiowa-Bijou Groundwater Mgmt. Dist., 77 P.3d 62,
 78-79 (Colo. 2003). Opposers contended that Independence
 could not satisfy the antispeculation doctrine because
 Independence did not have specific plans to put a specific
 amount of the augmented water to certain proposed uses.

 ¶3
 In response, Independence claimed that under this court's
 decision in East Cherry Creek Valley Water
 &Sanitation District v. Rangeview Metropolitan
 District, 109 P.3d 154 (Colo. 2005), the water court had
 no authority to apply the antispeculation doctrine when
 reviewing an application to amend an augmentation plan for
 not-nontributary groundwater. Independence argued that such
 authority lay instead with the State Engineer's Office
("SEO"), which applies the antispeculation doctrine
 as part of its well permitting process.

 ¶4
 The water court denied Opposers' motion, agreeing with
 Independence's understanding of East Cherry
 Creek and concluding that the anti-speculation doctrine
 did not apply to Independence's application. In re
 Application for Amend.

of an Augmentation Plan of Indep. Water &Sanitation
 Dist., No. 19CW3220, at 5-7 (Dist. Ct., Water
Div. 1, Mar. 6, 2023) ("March 6 Order"). The water
 court then entered a final decree approving
 Independence's proposed amendment to its augmentation
 plan. In re Application for Amend. of an Augmentation
 Plan of Indep. Water &Sanitation Dist., No.
 19CW3220, at 6 (Dist. Ct., Water Div. 1, May 2, 2023)
("Final Decree"). The Final Decree recited the
 holding in East Cherry Creek that water courts may
 not apply the anti-speculation doctrine when reviewing an
 application for a determination of rights in nondesignated,
 nontributary groundwater. Id. (citing E. Cherry
 Creek, 109 P.3d at 158). This reference in the Final
 Decree, read in conjunction with the water court's March
 6 Order, apparently implied that the same rule applies in the
 context of not-nontributary groundwater.
Id.

 ¶5
 Opposers appeal the Final Decree, asserting that the
 anti-speculation doctrine applies to Independence's
 application to amend its augmentation plan and that the
 record unambiguously demonstrates that Independence has not
 satisfied that doctrine. Specifically, Opposers argue that
 East Cherry Creek recognized a narrow exception to
 the anti-speculation doctrine that applies only to
 determinations of rights in nontributary
 Denver Basin groundwater and that this exception does not
 extend to applications to amend an augmentation plan
 for not-nontributary groundwater. As a result,
 Opposers claim, the anti-speculation

 doctrine does apply to Independence's proposed amendment
 to its augmentation plan, and the water court erred in
 failing to apply it. Furthermore, because Independence has
 never asserted a non-speculative intent with respect to
 certain uses of the augmented water in its proposed amendment
 to its augmentation plan, Opposers contend that this court
 should not only reverse the water court's relevant
 conclusions of law but also strike what Opposers describe as
 Independence's speculative uses from the amended
 augmentation plan.

 ¶6
 Independence, in contrast, submits that the reasoning in
 East Cherry Creek applies with equal force to the
 not-nontributary groundwater at issue here. In other words,
 Independence argues that both nontributary and
 not-nontributary groundwater are allocated on the basis of
 land ownership; accordingly, Independence maintains,
 landowners must generally satisfy the same requirements for
 obtaining a determination of rights in either nontributary or
 not-nontributary groundwater. Therefore, because East
 Cherry Creek precludes a water court from applying the
 anti-speculation doctrine to applications for determinations
 of rights in nontributary groundwater, the holding
 in that case necessarily precludes a water court from
 applying the anti-speculation doctrine to applications for
 determinations of rights in not-nontributary
 groundwater. Furthermore, Independence argues, because
 applications for determinations of rights in not-nontributary
 groundwater are "inexorably intertwined" with

applications to amend an augmentation plan for
 not-nontributary groundwater, East Cherry Creek
 forecloses application of the anti-speculation doctrine to
 applications to amend an augmentation plan for
 not-nontributary groundwater. Finally, Independence contends
 that the anti-speculation doctrine plays no role in a water
 court's review of augmentation plans in any event because
 such a review focuses solely on the question of potential
 injury. For these reasons, Independence asks that we adopt
 the water court's reasoning and affirm the Final Decree.

 ¶7
We affirm the water court's order, albeit on somewhat
 different grounds.

 ¶8
We begin by rejecting the water court's and
 Independence's reliance on East Cherry Creek
 because it does not resolve the narrow legal question
 Opposers present: whether the anti-speculation doctrine
 applies to an application to amend an augmentation plan for
 not-nontributary groundwater. Instead, to answer this
 question, we turn to the statutes governing the
 anti-speculation doctrine and augmentation plans, as well as
 our well-developed case law in both areas.

 ¶9
 Considering these authorities, we hold that the water court
 did not err in declining to apply the anti-speculation
 doctrine to Independence's application to amend its
 augmentation plan for not-nontributary groundwater. We reach
 this conclusion for two related reasons.

 ¶10
 First, because the anti-speculation doctrine and augmentation
 plans serve different purposes, it does not make sense for
 the water court to apply the doctrine

 as part of its review of an application to obtain or amend an
 augmentation plan. The anti-speculation doctrine exists to
 protect the integrity of the prior appropriation system by
 preventing would-be appropriators from hoarding water rather
 than putting it to beneficial use. By contrast, augmentation
 plans exist outside the prior appropriation system and afford
 a mechanism to further Colorado's policy of maximum use
 by allowing out-of-priority diversions of water that has
 already been appropriated, provided that such diversions do
 not result in injury to other water users. While the
 anti-speculation doctrine protects the future of the prior
 appropriation system, augmentation plans inject flexibility
 into that system without injuring existing water rights.

 ¶11
 Second, the only question relevant to a water court's
 review of an augmentation plan (or an amendment thereto) is
 whether the plan will cause injury to existing water rights.
While this inquiry necessarily leads the water court to
 consider a number of factors-including whether the applicant
 has put forward a proposed beneficial use-the sole purpose of
 evaluating those factors is to identify potential injury to
 existing water rights. The anti-speculation doctrine plays no
 role in this injury analysis.

 ¶12
 Here, the water court found that Independence's amended
 augmentation plan will not result in injury to existing water
 rights. We perceive no clear error

 in this finding. Therefore, we affirm the water court's
 approval of Independence's proposed amendment to its
 augmentation plan.[3]

 I.
Factual and Procedural Background

 ¶13
We begin by explaining the relevant terms of the 2006 Decree.
We then describe Independence's application to amend the
 augmentation plan that was initially approved as part of the
 2006 Decree. Finally, we trace the water court proceedings
 that brought this case before us.

 A.
The Initial Decree and Augmentation Plan

 ¶14
 Under the 2006 Decree obtained by Independence's
 predecessor-in-interest, Independence has 1,269 acre-feet per
 year of nontributary groundwater available for withdrawal
 from the Lower Dawson, Denver, Arapahoe, and Laramie-Fox
 Hills aquifers. 2006 Decree, at 2. Relevant here, the 2006
 Decree also includes 288.3 acre-feet per year of
 not-nontributary groundwater available for withdrawal from
 the Upper Dawson aquifer. Id. Both the nontributary
 and the not-nontributary groundwater are decreed for
 "use[], reuse[] and successive[] use[]" for
 "domestic, industrial, commercial, irrigation, stock
 watering, fire protection, and exchange and augmentation
 purposes, both on and off the Subject Property."
Id.

 ¶15
 In addition, the 2006 Decree approved a statutorily required
 augmentation plan for the not-nontributary groundwater.
See § 37-90-137(9)(c.5)(I)(A), C.R.S. (2024)
(requiring "judicial approval of plans for augmentation
 . . . prior to the use of" not-nontributary
 groundwater). The augmentation plan permits withdrawals of up
 to seventy-five of the 288.3 acre-feet per year of
 not-nontributary groundwater decreed to be available. 2006
 Decree, at 4. Notably, the plan lists only "inhouse and
 irrigation use on the Subject Property" as uses for this
 augmented water. Id. Finally, the plan designates
 "[r]eturn flows from either or both inhouse and
 irrigation use" as the sole source of water to replace
 depletions from the permitted withdrawals during pumping and
 reserves a portion of the decreed nontributary groundwater to
 replace depletions after pumping. Id. at 5.

 B.
Independence's Application to Amend the 2006 Augmentation
 Plan

 ¶16
 Upon acquiring the interests described in the 2006 Decree,
 Independence applied for an amendment to the augmentation
 plan. The proposed amendment would not alter the 2006
 Decree's limit on the withdrawal of not-nontributary
 groundwater to seventy-five acre-feet per year. However, it
 expands the list of uses included in the augmentation plan by
 incorporating all the uses adjudicated

 in the 2006 Decree-namely, "domestic,
 municipal,[4] industrial, commercial, irrigation, stock
 watering, fire protection, and exchange and augmentation
 purposes, both on and off the Subject Property," in
 addition to the inhouse and irrigation uses mentioned in the
 original augmentation plan. Independence's application
 did not specify how much (if any) of the seventy-five acre
 feet it would allocate to each use. Nor did it describe a
 plan to use any amount of this water off the Subject
 Property.

 ¶17
 In accordance with section 37-92-302(4), C.R.S. (2024), the
 water referee for Division 1 consulted with the Division 1
 Engineer, Corey DeAngelis, regarding Independence's
 application. In a summary of their consultation, DeAngelis
 requested that the water court require Independence to
 "document that the claimed return flows from septic
 systems and irrigation continue to cover the during-pumping
 stream depletions in time, location and amount." And, to
 the

 extent that Independence could not demonstrate sufficient
 return flows, DeAngelis stated that Independence "must
 be required to pump water directly into the stream in the
 amount that has not been replaced by return flows."

 ¶18
 Numerous individuals and entities from neighboring
 communities, including Opposers, filed statements of
 opposition. Later, several opposers submitted comments on
 initial and subsequent versions of the referee's proposed
 ruling. Opposers' statements and comments raised multiple
 concerns, including that Independence's application
 violated the anti-speculation doctrine.

 ¶19
 The referee's final ruling, issued in July 2021, did not
 address Opposers' concerns. Accordingly, Opposers filed
 protests reiterating, among other things, that
 Independence's application did not comply with the
 anti-speculation doctrine. Shortly thereafter, the water
 court set the case for a five-day trial.

 ¶20
 During discovery, Franktown submitted interrogatories to
 Independence requesting that Independence provide the
 "estimated annual amount of water" Independence
 would dedicate to each of its proposed new uses of the
 augmented water, as well as the locations in which it
 proposed to exercise those uses. Viewing these
 interrogatories as related to Franktown's claims under
 the anti-speculation doctrine, Independence responded that it
 was not required to make a threshold showing of
 non-speculative use under this court's decision in
 East Cherry Creek. Independence nevertheless
 provided estimates of its annual municipal and

 commercial demands.[5] Notably, Independence indicated that it
 had "no specific plans" to use the augmented water
 for domestic, industrial, exchange, or stockwatering
 purposes. Similarly, Independence stated that it had no
 specific plans to use its not-nontributary groundwater for
 augmentation purposes other than those covered in the
 original decree nor to use the augmented water for
 any purpose in "any location other than the
 Subject Property." Instead, Independence explained that
 it "may need to put" that water to any of its
 proposed uses to satisfy its "future water
 obligations."

 C.
Opposers' Motion for Summary Judgment

 ¶21
 Following discovery, Opposers moved for summary judgment
 pursuant to C.R.C.P. 56, arguing that the anti-speculation
 doctrine applies to an application to amend an augmentation
 plan to cover new uses for not-nontributary groundwater. In
 Opposers' view, Independence's discovery responses
 indisputably showed that Independence could not make the
 threshold showing of non-speculative intent required by the
 anti-speculation doctrine with respect to its proposal to add
 domestic, industrial, and stock-watering uses to its
 augmentation plan. Nor could Independence make a showing of
 non-speculative intent with

 respect to its proposal to add any use off the Subject
 Property. Accordingly, Opposers asked the water court to
 dismiss Independence's application with respect to these
 uses.[6]

 ¶22
 In its response, Independence asserted that East Cherry
 Creek precludes a water court from applying the
 anti-speculation doctrine to determinations of rights in
 Denver Basin groundwater, whether nontributary or
 not-nontributary. In East Cherry Creek, this court
 considered whether water courts must apply the
 anti-speculation doctrine when adjudicating a Denver Basin
 landowner's application for a determination of
 nontributary groundwater rights. 109 P.3d at 157. We held
 that water courts may not apply the anti-speculation doctrine
 when determining Denver Basin nontributary groundwater rights
 because the General Assembly reserved anti-speculation review
 for the SEO's well-permitting process. Id. at
 158. Independence argued that this holding in East Cherry
 Creek necessarily prohibits a water court from applying
 the anti-speculation doctrine to a

 determination of rights in not-nontributary groundwater
 because both not-nontributary and nontributary groundwater
 are allocated on the basis of land ownership. Therefore,
 Independence maintained, a water court is likewise
 prohibited from applying the anti-speculation doctrine to an
 application for an augmentation plan for not-nontributary
 groundwater (or an amendment to such an augmentation plan).
Independence further contended that the anti-speculation
 doctrine has no place in a water court's review of an
 augmentation plan in any event because such a review
 considers only whether implementation of the plan will
 injuriously affect existing water rights.

 ¶23
 The water court agreed with Independence. March 6 Order, at
 1. It, too, read East Cherry Creek
 as precluding a water court from applying the antispeculation
 doctrine to a determination of rights in not-nontributary
 groundwater. Id. at 4-5. The water court reasoned
 that because landowners have a statutory right to adjudicate
 their right to use Denver Basin groundwater for future,
 undetermined uses, water courts performing such adjudications
 may not apply the anti-speculation doctrine as part of their
 review. Id. Instead, the water court explained,
 anti-speculation review occurs only when the SEO considers an
 application for a well permit which, if successful,
 authorizes Denver Basin landowners to construct a well and,
 therefore, to actually exercise their adjudicated rights.
Id.

 ¶24
 The water court noted that, in this case, Independence's
 predecessor-in-interest had already adjudicated the rights in
 the 2006 Decree. Id. at 6. Therefore, Independence
 had a vested right to apply its not-nontributary groundwater
 to all uses listed in the 2006 Decree, including all
 the uses Independence sought to add to the 2006 augmentation
 plan. Id. The only question for the water court,
 then, was whether Independence's proposed amended
 augmentation plan would continue to avoid injury to other
 water users. Id. Accordingly, the water court denied
 Opposers' motion and concluded that, as a matter of law,
 the antispeculation doctrine did not apply to
 Independence's application. Id. at 7.

 D.
The Water Court's Final Decree

 ¶25
 Following the March 6 Order, Independence and Opposers
 stipulated to the entry of a final decree consistent with the
 water court's order. However, Opposers preserved their
 right to appeal the water court's conclusion that the
 antispeculation doctrine did not apply to Independence's
 application to amend its augmentation plan.

 ¶26
 The water court accepted the parties' stipulations,
 vacated the trial date, and entered a final decree. See
 generally Final Decree. The Final Decree amends
 Independence's augmentation plan in accordance with
 Independence's proposal, confirming that Independence may
 "use, reuse, and successive[ly] use" seventy-five
 acre-feet of its not-nontributary water "for in-house,
 municipal, domestic,

 industrial, commercial, irrigation, stock watering, fire
 protection, and exchange and augmentation purposes, on and
 off the Subject Property." Id. at 2. The plan
 continues to identify return flows as a means of replacing
 depletions associated with these withdrawals. Id. at
 3. However, in addition to return flows, and consistent with
 the summary of consultation prepared by Division Engineer
 DeAngelis, the plan requires Independence to directly release
 nontributary groundwater to the potentially affected surface
 streams if Independence's return flows prove inadequate
 to replace all depletions. Id. Finally, the plan
 includes provisions specifying how Independence will replace
 post-pumping depletions. Id. at 3-4; see also
Danielson v. Castle Meadows, Inc., 791 P.2d 1106, 1115
(Colo. 1990) (requiring that augmentation plans for
 not-nontributary groundwater provide for post-pumping
 depletions).

 ¶27
 The Final Decree also includes findings of fact and
 conclusions of law. As relevant here, the water court found
 that Independence's augmentation plan would not
 injuriously affect vested water rights or decreed conditional
 rights. Final Decree, at 5. In addition, citing East
 Cherry Creek, 109 P.3d at 158, the water court observed
 that, as a matter of law, the anti-speculation doctrine does
 not apply to judicial determinations of nondesignated,
 nontributary groundwater. Final Decree, at 6. Instead, the
 water court explained, the anti-speculation doctrine is
 "applied by the [SEO] during the well permitting
 process." Id. Although the

 water court did not expressly hold that the anti-speculation
 doctrine does not apply to judicial determinations of
 not-nontributary groundwater, the Final Decree
 implied as much. See id.

 ¶28
 Similarly, the water court did not expressly conclude that
 the antispeculation doctrine does not apply to an application
 to amend an augmentation plan for not-nontributary
 groundwater. See id. However, it did conclude that
 "an augmentation plan is intended to prevent injury to
 owners or users of surface water or tributary
 groundwater" and that, because Independence's
 amended augmentation plan "will not injuriously
 affect" such water rights, "it shall be
 approved." Id. Accordingly, the water court
 approved Independence's amended augmentation plan
 consistent with Independence's proposal and without
 performing an anti-speculation analysis. Id.

 ¶29
 Opposers appealed the Final Decree.

 II.
Standard of Review

 ¶30
We review a water court's conclusions of law de novo.
Dill v. Yamasaki Ring, LLC, 2019 CO 14, ¶ 23,
 435 P.3d 1067, 1074. In contrast, "[w]e accept the water
 court's factual findings on appeal unless they are so
 clearly erroneous as to find no support in the record."
Burlington Ditch Reservoir &Land Co. v. Metro
 Wastewater Reclamation Dist., 256 P.3d 645, 660 (Colo.
2011), as modified on denial of reh'g (June 20,
 2011).

 ¶31
 Opposers have made clear that they are appealing the Final
 Decree-indisputably a "judgment and decree" subject
 to our review. C.A.R. 1(a)(2). We acknowledge, however, that
 the Final Decree does not expressly conclude that a water
 court may not apply the anti-speculation doctrine in
 evaluating an application to amend an augmentation plan for
 the use of not-nontributary groundwater. Further, we
 recognize that to the extent the water court's order
 denying Opposers' motion for summary judgment does reach
 this conclusion, orders denying summary judgment are usually
 "unappealable interlocutory ruling[s]." Manuel
 v. Fort Collins Newspapers, Inc., 631 P.2d 1114, 1116
(Colo. 1981).

 ¶32
We do not view the absence from the Final Decree of an
 express conclusion regarding the applicability of the
 anti-speculation doctrine to an application to amend an
 augmentation plan as a barrier to our review. The Final
 Decree approved Independence's amendment to its
 augmentation plan in full without applying the
 anti-speculation doctrine based, at least in part, on the
 water court's order denying Opposers' motion for
 summary judgment. Final Decree, at 6. In addition, the Final
 Decree specifically reflected the water court's finding
 that the amended augmentation plan would not cause injury to
 vested water rights or decreed conditional rights.
Id. at 5. Therefore, the Final Decree fully captures
 the issues raised in this appeal.

 III.
Analysis

 ¶33
 Because the heart of the parties' dispute is their
 diverging interpretations of East Cherry Creek, we
 begin with a discussion of that case and the parties'
 arguments concerning it. Ultimately, however, we conclude
 that East Cherry Creek does not answer the narrow
 legal question before us: whether the anti-speculation
 doctrine applies to a Denver Basin landowner's
 application to amend an augmentation plan for
 not-nontributary groundwater. To resolve that question, we
 consider the principles underlying the anti-speculation
 doctrine and the concept and requirements of augmentation
 plans. We hold that the water court did not err in declining
 to apply the anti-speculation doctrine to Independence's
 application to amend its augmentation plan for
 not-nontributary groundwater. Accordingly, we affirm the
 water court's judgment and decree approving
 Independence's amended augmentation plan.

 A.
East Cherry Creek

 Does
 Not Resolve Whether the AntiSpeculation Doctrine Applies to
 Independence's Application

 ¶34
East Cherry Creek concerned nontributary groundwater
 in the Denver Basin. 109 P.3d at 157. To provide necessary
 context for our discussion of East Cherry Creek, we
 briefly review the legal framework governing Denver Basin
 groundwater. We then discuss East Cherry Creek's
 holding, present the parties'

 conflicting views of that holding, and, finally, explain why
 East Cherry Creek does not govern our decision
 today.

 1.
Denver Basin Groundwater

 ¶35
 The Denver Basin encompasses portions of the Dawson
 (including Upper and Lower portions), Denver, Arapahoe, and
 Laramie-Fox Hills aquifers that underlie an approximately
 6,700-square-mile region covering much of the Front Range.
Parker Water &Sanitation Dist. v. Rein, 2024 CO
 71M, ¶ 10, 559 P.3d 217, 223. Though groundwater in most
 of Colorado is presumed to be tributary and, therefore,
 subject to the prior appropriation system, N.
 Kiowa-Bijou, 77 P.3d at 70, the General Assembly has
 distinguished Denver Basin groundwater from other groundwater
 in Colorado for two reasons, § 37-90-103(10.5), C.R.S.
(2024). First, Denver Basin groundwater carries immense
 economic importance relative to its de minimis impact on
 surface streams. Id. Second, it is feasible to
 account for those de minimis impacts by replacing the limited
 surface water depletions associated with pumping from the
 Denver Basin. Id.; Water Rts. of Park Cnty.
 Sportsmen's Ranch LLP v. Bargas, 986 P.2d 262, 266
(Colo. 1999), as modified on denial of reh'g
(Oct. 4, 1999).

 ¶36
 For these reasons, the General Assembly crafted a
 classification and administration scheme that is unique to
 the Denver Basin. N. Kiowa-Bijou, 77 P.3d at 73
 n.19. Specifically, Denver Basin groundwater is divided into
 two categories:

(1) nontributary groundwater, defined, like nontributary
 groundwater in other parts of Colorado, as groundwater
 "the withdrawal of which will not, within one hundred
 years of continuous withdrawal, deplete the flow of a natural
 stream . . . at an annual rate greater than one-tenth of one
 percent of the annual rate of withdrawal," §
 37-90-103(10.5). But see Bargas, 986 P.2d at 265,
 267 (explaining the hydrostatic pressure assumption, which
 applies only when determining whether Denver Basin
 groundwater is nontributary); and (2) not-nontributary
 groundwater, which exists only in the Denver Basin and is
 defined as groundwater that does not meet the definition of
 nontributary groundwater because withdrawing it
 "will, within one hundred years, deplete the
 flow of a natural stream . . . at an annual rate of greater
 than one-tenth of one percent of the annual rate of
 withdrawal," § 37-90-103(10.7) (emphasis added);
see also Bargas, 986 P.2d at 274-75 (clarifying that
 not-nontributary groundwater is statutorily limited to the
 Denver Basin).

 ¶37
 Nontributary groundwater throughout Colorado is not allocated
 under the prior appropriation system, but rather "upon
 the basis of ownership of the overlying land." §
 37-90-102(2), C.R.S. (2024); see also Parker, ¶
 21, 559 P.3d at 227. This statutory scheme confers upon
 landowners an inchoate right to control and use the
 nontributary groundwater beneath their land that vests when
 the SEO issues a well permit or when the water court issues a
 decree determining the

 landowner's rights in the underlying groundwater.
Parker, ¶¶ 19, 21, 559 P.3d at 227; N.
 Kiowa-Bijou, 77 P.3d at 71-72. Not-nontributary
 groundwater is also "administered on the basis of land
 ownership ...." N. Kiowa-Bijou, 77 P.3d at 74.
Unlike nontributary groundwater, however, Denver Basin
 landowners must obtain "judicial approval of plans for
 augmentation . . . prior to the use of [their
 not-nontributary] groundwater." §
 37-90-137(9)(c.5)(I)(A).

 2.
East Cherry Creek

 ¶38
 In East Cherry Creek, we were asked to decide
 whether water courts must apply the anti-speculation doctrine
 as part of adjudicating a Denver Basin landowner's
 application for a determination of rights in nontributary
 groundwater. 109 P.3d at 157. We held that water courts may
 not apply the doctrine in this context. Id. at 158.
We began by explaining that section 37-90-137(6) allows
 Denver Basin landowners to commence adjudication proceedings
 "at any time" to seek a determination of rights
 "not only for existing, but also for future, uses."
E. Cherry Creek, 109 P.3d at 157. Thus, in
 contrast to a conditional use right-the context in which we
 first announced the antispeculation doctrine, Colo. River
 Water Conservation Dist. v. Vidler Tunnel Water Co., 594
 P.2d 566, 569 (Colo. 1979)-a determination of rights in
 nontributary groundwater neither requires applicants to
 present a date by which they will begin a withdrawal project
 nor to show reasonable diligence towards completing such a

 project. E. Cherry Creek, 109 P.3d at 157. Allowing
 a water court to apply the antispeculation doctrine at the
 adjudication stage would, therefore, "thwart a clearly
 expressed legislative intent to permit adjudication for
 future uses without a corresponding obligation to develop
 them." Id. at 158.

 ¶39
 Nevertheless, we continued, "the legislature has also
 made clear . . . that nontributary ground water may be
 withdrawn solely for beneficial uses." Id. To
 satisfy this condition, we explained that the legislature
 requires a Denver Basin landowner who seeks to use their
 nontributary groundwater to obtain a permit from the SEO.
Id. Under that permitting scheme, the SEO may issue
 a permit authorizing a Denver Basin landowner to construct a
 well only if that landowner demonstrates that the
 nontributary groundwater will be put to a beneficial use.
Id.; see also § 37-90-137(1)(b)(II)
(requiring that permit applicants specify their
 "proposed beneficial use"); § 37-90-137(4)(a)
(clarifying that the permit requirements in sections
 37-90-137(1) and (2) apply to permits for nontributary and
 not-nontributary groundwater).

 ¶40
 Accordingly, we held that the legislature established "a
 clear demarcation between," on the one hand, "the
 determination of available water underlying particular
 lands," and on the other, "the regulation of its
 withdrawal and use." E. Cherry Creek, 109 P.3d
 at 158. Because the legislature delegated the latter to the
 SEO, we concluded that the legislature directed the SEO to
 apply the anti-

 speculation doctrine as part of its permitting process,
 thereby precluding water courts from applying the doctrine
 when adjudicating rights in nontributary groundwater.
Id.

 3.
The Parties' Arguments Concerning East
 Cherry Creek

 ¶41
 Opposers construe East Cherry Creek as announcing a
 "limited exception" to the anti-speculation
 doctrine that applies only to determinations of
 rights in nontributary Denver Basin
 groundwater. Thus, they argue, East Cherry Creek has
 no bearing on whether water courts may apply the
 anti-speculation doctrine in reviewing an application to
 amend an augmentation plan for not-nontributary
 groundwater. In the context of such applications,
 Opposers submit that because only the water court can approve
 an augmentation plan (or an amendment thereto), application
 of the anti-speculation doctrine cannot be relegated to the
 SEO as it is in the context of a determination of rights in
 nontributary groundwater under East Cherry Creek.
Rather, Opposers maintain, only the water court has the
 authority to apply the anti-speculation doctrine here because
 only the water court has the authority to review an
 augmentation plan.

 ¶42
 Independence, in contrast, contends that a water court may
 not apply the anti-speculation doctrine to an application to
 amend an augmentation plan for not-nontributary groundwater
 for three reasons.

 ¶43
 First, Independence argues that East Cherry Creek
 applies with equal force to determinations of rights in
 not-nontributary groundwater because, like
 nontributary groundwater, not-nontributary groundwater is
 allocated on the basis of land ownership for purposes of any
 present or future use. Accordingly, Independence maintains,
 the same factors that determine the availability of
 nontributary Denver Basin groundwater determine the
 availability of not-nontributary groundwater. Those
 factors do not, in Independence's view, include
 compliance with the anti-speculation doctrine.

 ¶44
 Second, Independence contends that the water court's
 approval of an augmentation plan for not-nontributary
 groundwater (or an amendment thereto) is "inexorably
 intertwined" with the determination-of-rights process.
Therefore, in Independence's view, because East
 Cherry Creek prohibits a water court from applying the
 anti-speculation doctrine when reviewing an application for a
 determination of rights in not-nontributary groundwater, the
 reasoning of that decision also prohibits a water court from
 applying the doctrine when reviewing an application for an
 augmentation plan for not-nontributary groundwater (or an
 application to amend such a plan).

 ¶45
 Finally, Independence asserts, separate and apart from
 East Cherry Creek, that a water court's review
 of an application for an augmentation plan does not implicate
 the anti-speculation doctrine because the only question
 before the water

court in such proceedings is whether the augmentation plan
 will result in injury to existing water rights.

 4.
East Cherry Creek Does Not Apply
 Here

 ¶46
 To the extent Opposers argue that East Cherry Creek
 does not govern this case, we agree. As an initial matter,
 the circumstances of East Cherry Creek required the
 water court to examine a Denver Basin landowner's
 determination of rights in nontributary
 groundwater. 109 P.3d at 156-57. By contrast, the application
 here seeks to amend an augmentation plan for
 not-nontributary groundwater. East Cherry
 Creek does not address whether a water court must apply
 the anti-speculation doctrine to an application for a
 determination of rights in not-nontributary
 groundwater. Nor is it necessary for us to reach that
 question because the application here concerns only an
 amendment to an existing augmentation plan.

 ¶47
 Relatedly, we reject Independence's assertion that the
 approval of an augmentation plan for not-nontributary
 groundwater is "inexorably intertwined" with a
 determination of rights in the water to be augmented. A
 Denver Basin landowner pursues a determination of rights to
 vest their inchoate rights in Denver Basin groundwater.
Id. at 157; N. Kiowa-Bijou, 77 P.3d at 74.
Those applying for an augmentation plan, in contrast, seek
 judicial approval of a plan to divert water out of priority
 to the extent they can do so without causing injury to
 existing water rights by replacing their out-of-priority
 depletions with water from

 a legally available source. Empire Lodge Homeowners'
 Ass'n v. Moyer, 39 P.3d 1139, 1150 (Colo. 2001),
 as modified on denial of reh'g (Feb. 11, 2002).
Although Denver Basin landowners may not exercise their
 vested rights in not-nontributary groundwater without an
 augmentation plan, nothing precludes them from obtaining a
 determination of rights before they secure the water
 court's approval of an augmentation plan. Indeed, that is
 precisely what Independence's predecessor-in-interest did
 with respect to the amount of not-nontributary groundwater
 included in the 2006 Decree for which neither Independence
 nor Independence's predecessor has ever proposed an
 augmentation plan.

 ¶48
 The question we must answer here is whether the water court
 erred in declining to apply the anti-speculation doctrine to
 an application to amend an augmentation plan for
 not-nontributary groundwater. East Cherry Creek did
 not address this question. Accordingly, we look elsewhere to
 resolve it.

 B. The
 Water Court Did Not Err in Declining to Apply the
 Anti-Speculation Doctrine to Independence's Application

 ¶49
 To address Opposers' contention that the water court
 erred in failing to apply the anti-speculation doctrine to
 Independence's application for an amendment to its
 augmentation plan, we consider the relationship between the
 issues underlying a water court's review for compliance
 with the anti-speculation doctrine on the one hand, and the
 issues involved in a water court's consideration

 of an application for an augmentation plan on the other. We
 conclude that the water court did not err in declining to
 apply the anti-speculation doctrine to Independence's
 application to amend its augmentation plan in
 not-nontributary groundwater for two reasons: (1) the
 anti-speculation doctrine and augmentation plans serve
 different purposes, and (2) the only question relevant to a
 water court's review of an augmentation plan (or an
 amendment thereto) is whether the plan will cause injury to
 existing water rights.

 1.
The Anti-Speculation Doctrine and Augmentation Plans Serve
 Different Purposes

 ¶50
 At its core, the anti-speculation doctrine precludes a water
 rights applicant from claiming an intent to appropriate water
 "based upon the subsequent speculative sale or transfer
 of the appropriative rights." City of Thornton v.
 Bijou Irrigation Co., 926 P.2d 1, 36 (Colo. 1996). To
 accomplish this objective, those seeking to appropriate water
 or to change a water right must demonstrate that they have
 "a specific plan and intent to divert, store, or
 otherwise capture, possess, and control a specific quantity
 of water for specific beneficial uses." §
 37-92-103(3)(a), C.R.S. (2024); High Plains A &M, LLC
 v. Se. Colo. Water Conservancy Dist., 120 P.3d 710,
 719-21 (Colo. 2005) (applying the anti-speculation doctrine
 to applications for a change of water right to ensure that
 change proceedings fulfill their "essential
 function" of "confirm[ing] that a valid
 appropriation continues"); see also Vidler, 594
 P.2d at 568 (noting that applicants

 seeking to appropriate water "must have an intent to
 take the water and put it to beneficial use"). Thus, the
 purpose of the anti-speculation doctrine is to prevent water
 hoarding for personal profit, thereby preserving water for
 beneficial use within the prior appropriation system.
Vidler, 594 P.2d at 568.

 ¶51
 Unlike the anti-speculation doctrine, which is designed to
 protect the integrity of appropriations within the prior
 appropriation system, augmentation plans exist specifically
 to "allow[] a diversion outside of the priority
 system." Empire Lodge, 39 P.3d at 1155
(emphasis added); see also Buffalo Park Dev. Co. v.
 Mountain Mut. Reservoir Co., 195 P.3d 674, 685 (Colo.
2008) (explaining that augmentations plans "allow
 diversions in areas where they would not be possible
 otherwise" because "unappropriated water is not
 available" there), as modified on denial of
 reh'g (Nov. 24, 2008). To accomplish this,
 augmentation plans describe "a detailed program . . . to
 increase the supply of water available for beneficial
 use" by, as relevant here, "providing substitute
 supplies of water." § 37-92-103(9). The substitute
 supply must offset the applicant's proposed
 out-of-priority depletions in an amount sufficient to prevent
 injury. See § 37-92-305(3)(a), C.R.S. (2024);
Empire Lodge, 39 P.3d at 1150. Thus, augmentation
 plans offer a method by which to "implement a policy of
 maximum flexibility" while also "protect[ing] the
 constitutional doctrine of prior appropriation."
Empire Lodge, 39 P.3d at 1150.

 ¶52
 Given the distinct purposes of the anti-speculation doctrine
 and augmentation plans, applying the anti-speculation
 doctrine to applications for such plans (or amendments
 thereto) would make no sense. Augmentation plans permit
 diversions of water that other users have already
 appropriated by ensuring that a supply sufficient to avoid
 injury to those users is available for replacement purposes,
 thereby protecting existing water rights while advancing
 Colorado's policy of maximum use. See id. This
 scheme could not encourage hoarding water "for personal
 profit" to the exclusion of future users seeking to
 appropriate that water for a beneficial use, Vidler,
 594 P.2d at 568, because the augmented water is not available
 for appropriation in the first place, Buffalo Park,
 195 P.3d at 685. Nor could an augmentation plan threaten to
 transform an existing appropriative right into a speculative
 right, High Plains, 120 P.3d at 720, because
 augmentation plans merely ensure that existing water-rights
 holders can continue to exercise their appropriative rights
 in the water to be augmented (albeit with the replacement
 supply). Thus, applying the anti-speculation doctrine to
 applications for an augmentation plan (or applications to
 amend such plans) would not serve the purpose of such plans:
 to accommodate diversions of water outside the priority

 system by providing a substitute supply sufficient to prevent
 injury to other appropriators.[7]

 2. The
 Sole Inquiry in Reviewing an Augmentation Plan Application Is
 Whether the Plan Will Injure Existing Water Rights

 ¶53
 Under section 37-92-305(3)(a), a water court's task in
 reviewing an augmentation plan is to determine whether the
 proposed plan will "injuriously affect" vested
 water rights or decreed conditional rights. Performing this
 injury

 analysis requires that water courts "consider the
 depletions from an applicant's use or proposed use of
 water, in quantity and in time, [and] the amount and timing
 of augmentation water that would be provided by the
 applicant." § 37-92-305(8)(a). If the water court
 determines that the proposed augmentation plan will not
 result in injury, it "shall" approve the plan.
§ 37-92-305(3)(a); see also Upper Eagle Reg'l
 Water Auth. v. Simpson, 167 P.3d 729, 735 (Colo. 2007)
("[O]nly if operation of the [augmentation] plan would
 cause injury . . . does the statute require the water judge
 to deny the plan."), as modified on denial of
 reh'g (Oct. 1, 2007).

 ¶54
 The same statutory requirements that govern applications for
 new augmentation plans also govern an application that, like
 Independence's, seeks to amend an existing augmentation
 plan. Coors Brewing Co. v. City of Golden, 2018 CO
 63, ¶ 25 n.1, 420 P.3d 977, 984 n.1 (explaining that
 amendments to an augmentation plan "must, at a minimum,
 comply with the requirements of both subsections
 37-92-305(3), (5), and (8) and our case precedents");
cf. Crystal Lakes Water &Sewer Ass'n v.
 Backlund, 908 P.2d 534, 542 (Colo. 1996) (explaining
 that water courts have the authority to "define the
 scope" of an augmentation plan and otherwise
 "adjust such a plan upon reconsideration").
Similarly, augmentation plans for not-nontributary
 groundwater must generally satisfy the same statutory
 criteria as

 augmentation plans for tributary water.[8] §
 37-90-137(9)(c.5)(I)(B), (C) (requiring that augmentation
 plans permitting the use of not-nontributary groundwater
 "meet all other statutory criteria" associated with
 augmentation plans); see also Danielson, 791 P.2d at
 1113 ("[T]he General Assembly, by using the term
 'plans for augmentation' in section
 37-90-137(9)(c) [later renumbered section
 37-90-137(9)(c.5)], intended that the term carry the same
 meaning in that subsection as elsewhere in the statutes
 governing water resources.").

 ¶55
 In sum, under section 37-92-305(3)(a), a water court asked to
 approve an application for an augmentation plan (or an
 amendment thereto) is concerned with a single question,
 regardless of the type of water to be augmented: whether the
 proposed plan will result in injury to vested water rights or
 decreed conditional

 rights.[9] Though answering this question may require
 the water court to consider multiple factors, its focus
 remains the same: "to ascertain whether vested water
 rights will sustain injury." Upper Eagle Reg'l
 Water Auth., 167 P.3d at 735.

 ¶56
 For example, an applicant for an augmentation plan may need
 to estimate the "time, amount, and location of return
 flows" associated with its proposed out-of-priority
 diversions if the applicant plans to rely on return flows to
 ensure that water is available in the quantity and at the
 time necessary to prevent injury. Farmer's Reservoir
 &Irrigation Co. v. Consol. Mut. Water Co., 33 P.3d
 799, 808 &n.6 (Colo. 2001), as modified on denial of
 reh'g (Nov. 13, 2001). To estimate return flows

 with the degree of certainty that this injury analysis
 requires, the applicant must put forward proposed beneficial
 uses of the augmented water, consistent with the statutory
 definition of augmentation plans. § 37-92-103(9)
(defining an augmentation plan as a "detailed program .
 . . to increase the supply of water available for beneficial
 use"). Thus, a water court could not approve an
 augmentation plan if the applicant entirely failed to
 identify any proposed beneficial use but then purported to
 rely exclusively on return flows as a substitute supply for
 replacing depletions. This is because, in such a scenario,
 the applicant would have failed to "identify the sources
 and character of the substitute supplies with
 certainty," creating an intolerable risk of injury.
Centennial Water &Sanitation Dist. v. City &Cnty.
 of Broomfield, 256 P.3d 677, 683 (Colo. 2011); see
 also Buffalo Park, 195 P.3d at 684 (explaining that
 applicants "must first establish . . . the availability
 of replacement water" before demonstrating that their
 proposed depletions will not cause injury (quoting City
 of Aurora ex rel. Util. Enter. v. Colo. State Eng'r,
 105 P.3d 595, 615 (Colo. 2005))); Williams v. Midway
 Ranches Prop. Owners Ass'n, 938 P.2d 515, 522 (Colo.
1997) ("An essential component of an augmentation plan
 is the provision for adequate replacement water.");
Weibert v. Rothe Brothers, Inc., 618 P.2d 1367, 1373
(Colo. 1980) ("In order to determine the adequacy of the
 [augmentation] plan to accomplish its intended purpose, it is
 necessary to consider the adequacy of the replacement water
 rights.").

 ¶57
 But the fact that an augmentation plan applicant may propose
 specific beneficial uses for its augmented water to prove
 that the plan will not result in injury does not mean that
 the applicant must demonstrate an intent to put that
 augmented water to those beneficial uses, as the
 anti-speculation doctrine requires. §
 37-92-103(3)(a)(II) (requiring "a specific plan and
 intent to divert, store, or otherwise capture, possess, and
 control a specific quantity of water for
 specific beneficial uses" (emphases added));
see also Vidler, 594 P.2d at 568-69; High
 Plains, 120 P.3d at 720. Rather, applicants need only
 show that if the beneficial use of their augmented water
 changes, they will still have sufficient supplies of
 replacement water to prevent injury. Farmer's
 Reservoir &Irrigation Co., 33 P.3d at 808 n.6. Thus,
 the statutory scheme governing augmentation plans tolerates
 some degree of uncertainty in the future operation of the
 plan to "implement a policy of maximum flexibility that
 also protect[s] the constitutional doctrine of prior
 appropriation." Empire Lodge, 39 P.3d at 1150.

 ¶58
 Indeed, a water court decree approving an augmentation plan
 represents no more than a "prediction of how
 the plan can operate" to permit out-of-priority
 diversions "without causing injury to existing water
 rights." Well Augmentation Subdistrict of Cent.
 Colo. Water Conservancy Dist. v. Centennial Water
 &Sanitation Dist., 2019 CO 12, ¶ 10, 435 P.3d
 469, 472 (emphasis added). Approving a "prediction"
 of how an augmentation plan will operate does not require the
 water

court to consider the applicant's intent to execute that
 plan. The "prediction" remains valid regardless of
 when the decree-holder begins to operate the plan.

 ¶59
 For these reasons, we hold that the water court did not err
 in declining to apply the anti-speculation doctrine to
 Independence's application to amend its augmentation
 plan. Therefore, we need only review the water court's
 determination that Independence's amended augmentation
 plan will not result in injury.

 C.
Independence's Proposed Augmentation Plan, as Amended,
 Will Not Result in Injury

 ¶60
 The water court found that Independence's amended
 augmentation plan "will not injuriously affect the owner
 of or persons entitled to use water under a vested water
 right or a decreed conditional water right." Final
 Decree, at 5. Opposers have not contested this finding. And
 even if they had, we perceive no basis for characterizing the
 water court's finding as clearly erroneous.
Independence's application estimates that its return
 flows from irrigation alone will equal almost four times its
 estimated actual depletions. Id. at 2-3. And even if
 Independence's return flows ultimately prove inadequate,
 the augmentation plan requires that Independence use its
 abundant nontributary groundwater to replace all depletions.
Id. at 2.

 ¶61
 Therefore, we affirm the water court's conclusion that
 Independence's amended augmentation plan will not result
 in injury to existing water rights.

 IV.
Conclusion

 ¶62
 The anti-speculation doctrine requires that potential
 appropriators demonstrate an intent to put the water rights
 they seek to a beneficial use, thereby preventing those who
 seek to hold such rights only for potential future profit
 from obtaining a use right. N. Kiowa-Bijou, 77 P.3d
 at 78-79. Accordingly, potential appropriators must present a
 specific plan and intent to divert a
 specific quantity of water for specific
 beneficial uses. § 37-92-103(3)(a)(II). This requirement
 protects the integrity of the prior appropriation system by
 reinforcing the constitutional guarantee of "a right to
 appropriate, not a right to speculate." Vidler,
 594 P.2d at 568.

 ¶63
 In contrast, an augmentation plan is merely a tool designed
 to increase the amount of water available for some
 beneficial use at some point in time without causing
 injury to vested water rights or conditional decreed rights.
§ 37-92-103(9). Judicial approval of a proposed
 augmentation plan (or an amendment thereto) may require the
 water court to consider multiple factors-such as the quantity
 and timing of depletions, the amount of likely return flows,
 and the beneficial uses for the augmented water-to the extent
 necessary to confirm that the proposal will not result in
 injury. §§ 37-92-103(9), -305(8)(a); Upper
 Eagle Reg'l Water Auth., 167 P.3d at 735. This
 injury inquiry does not require a water court to ascertain an
 augmentation plan applicant's specific intent with
 respect to the use of the water

 to be augmented. Rather, the water court need only determine
 whether the applicant's plan, as proposed, will prevent
 injury. That is precisely what the water court did here.

 ¶64
 Accordingly, because we perceive no clear error in the water
 court's finding that Independence's amended
 augmentation plan will not result in injury, we affirm the
 water court's judgment and decree.

 JUSTICE GABRIEL, concurring in the judgment.

 ¶65
 The majority holds that the water court did not err in
 declining to apply the anti-speculation doctrine to
 Independence Water and Sanitation District's application
 to amend its augmentation plan for not-nontributary
 groundwater. Maj. op. ¶ 9. The majority principally
 bases this conclusion on its view that the anti-speculation
 doctrine and augmentation plans serve different purposes and,
 therefore, it makes no sense for a water court to apply the
 anti-speculation doctrine in connection with its review of an
 application to obtain or amend an augmentation plan.
Id. at ¶ 10. On this basis, the majority
 affirms the water court's judgment and decree.
Id. at ¶ 64.

 ¶66
 Although I agree with the majority's ultimate conclusion,
 I cannot agree with its reasoning. Accordingly, I
 respectfully concur in the judgment, only.

 I.
Analysis

 ¶67
 No party in this case has argued that the anti-speculation
 doctrine never applies to an application to obtain or amend
 an augmentation plan, as the majority now effectively holds.
Accordingly, I do not believe that the parties have been
 given a full and fair opportunity to be heard on that
 question.

 ¶68
 Nor did the water court rule on the broad ground on which the
 majority bases its ruling. Rather, relying on East Cherry
 Creek Valley Water &Sanitation District v. Rangeview
 Metropolitan District, 109 P.3d 154, 157-58 (Colo.
2005), the

 water court began with the apparently undisputed premise that
 because a landowner has the statutory right to adjudicate the
 right to use Denver Basin nontributary, nondesignated
 groundwater for future, undetermined uses, the
 anti-speculation doctrine does not apply to adjudications of
 that right. The court then observed that we recognized in
 Colorado Ground Water Commission v. North Kiowa-Bijou
 Groundwater Management District, 77 P.3d 62, 74 (Colo.
2003), that Denver Basin groundwater located outside of a
 designated basin that is partially tributary because it does
 not satisfy the definition of Denver Basin nontributary
 groundwater (i.e., not-nontributary groundwater) "shall
 nevertheless be administered on the basis of land ownership
 as if it were nontributary, provided its use is
 augmented." Accordingly, the water court concluded that
 for the same reasons that the anti-speculation doctrine is
 inapplicable to adjudications of Denver Basin nontributary,
 nondesignated groundwater, that doctrine is inapplicable to
 adjudications of the not-nontributary groundwater at issue
 here, which, by definition, is nondesignated Denver Basin
 groundwater subject to the same separate water use system
 that applies to nontributary groundwater. (In reaching this
 conclusion, the water court did not rely solely on East
 Cherry Creek, as the majority seems to suggest. Maj. op.
 ¶¶ 4, 8. Rather, it so concluded by reading
 East Cherry Creek together with North
 Kiowa-Bijou Groundwater Management District.)

 ¶69
 Having thus decided that the not-nontributary groundwater at
 issue should be treated like Denver Basin nontributary water,
 the water court turned to the narrow issue presented and
 observed that Independence had already obtained water court
 approval to use not-nontributary Upper Dawson groundwater for
 certain decreed uses and therefore had a vested right to do
 so. Thus, the court viewed the only question before it as
 concerning the changes required to the augmentation plan to
 avoid injury to out-of-priority depletions that Independence
 would cause when it used its not-nontributary Upper Dawson
 groundwater for the decreed purposes. In these circumstances,
 the court concluded, as a matter of law, that the
 anti-speculation doctrine did not apply to Independence's
 request to add previously adjudicated uses to the
 augmentation plan.

 ¶70
 In light of the foregoing, unlike the majority, I perceive no
 reason to adopt a broad rule, which neither the parties nor
 the water court below advanced, that the anti-speculation
 doctrine never applies to an application to obtain or amend
 an augmentation plan. Rather, I would simply follow the water
 court's narrower reasoning, which I believe is well
 supported by our case law.

 ¶71
 I believe that the foregoing analysis is more in line with
 the arguments that the parties actually presented to us. It
 is also more consistent with long-settled principles of
 judicial restraint, which dictate that courts should decide
 only the issues necessary to resolve the cases before them-no
 more and no less.

 IL
 Conclusion

 ¶72
 For these reasons, I respectfully concur in the judgment,
 only.

---------

[1] The Denver Basin encompasses those
 portions of the Dawson (including the Upper and Lower
 portions), Denver, Arapahoe, and Laramie-Fox Hills aquifers
 that underlie an approximately 6,700-square-mile region
 "stretching from Greeley on the north, Colorado Springs
 on the south, the front-range hogback on the west, and Limon
 on the east." Parker Water & Sanitation Dist. v.
 Rein, 2024 CO 71M, ¶ 10, 559 P.3d 217, 223 (quoting
Colo. Ground Water Comm'n v. N. Kiowa-Bijou
 Groundwater Mgmt. Dist., 77 P.3d 62, 72 (Colo.
2003)).

[2] "Nontributary groundwater"
 refers to groundwater "the withdrawal of which will not,
 within one hundred years of continuous withdrawal, deplete
 the flow of a natural stream . . . at an annual rate greater
 than one-tenth of one percent of the annual rate of
 withdrawal." § 37-90-103(10.5), C.R.S. (2024).
Not-nontributary groundwater, by contrast, describes
 groundwater in the Denver Basin "the withdrawal of which
 will, within one hundred years, deplete the flow of
 a natural stream . . . at an annual rate of greater than
 one-tenth of one percent of the annual rate of
 withdrawal." § 37-90-103(10.7) (emphasis added);
see also Water Rts. of Park Cnty. Sportsmen's Ranch
 LLP v. Bargas, 986 P.2d 262, 274-75 (Colo. 1999)
(clarifying that not-nontributary groundwater exists only in
 the Denver Basin), as modified on denial of
 reh'g (Oct. 4, 1999). Both nontributary and
 not-nontributary groundwater are, by definition,
 nondesignated groundwater. § 37-90-103(10.5), (10.7).
"Designated groundwater" is groundwater that
 "in its natural course would not be available to and
 required for the fulfillment of decreed surface rights"
 or that is located "in areas not adjacent to a
 continuously flowing natural stream" where groundwater
 is the "principal" water source. §
 37-90-103(6)(a). Though designated groundwater exists in the
 Denver Basin, see N. Kiowa-Bijou, 77 P.3d at 77-78,
 none of the groundwater at issue here is designated.
Therefore, our discussions of groundwater in this opinion
 refer to nondesignated groundwater, unless otherwise
 stated.

[3] To the extent the Final Decree implied
 that water courts may not apply the antispeculation doctrine
 when determining a Denver Basin landowner's rights in
 not-nontributary groundwater, we express no opinion on that
 issue.

[4] The 2006 Decree does not mention
 municipal use, either in the list of decreed uses or in the
 augmentation plan. See 2006 Decree, at 2, 4. The
 water court assumed that Independence's application
 either erroneously included municipal uses, or that
 Independence had withdrawn that aspect of its proposal.
However, Independence's answer brief before this court
 clarifies that its application sought to add municipal use to
 both its list of decreed uses and its augmentation plan.
Nevertheless, the Final Decree includes municipal use only in
 the amended augmentation plan; it does not add municipal use
 to the list of decreed uses. Final Decree, at 1-2. Opposers
 do not argue that the absence of municipal use from
 Independence's list of decreed uses precludes
 Independence from putting its not-nontributary groundwater to
 municipal use in accordance with its amended augmentation
 plan. Therefore, we do not consider this question
 here.

[5] Specifically, Independence predicted
 that it would need 0.84 acre-feet per year to serve a future
 community clubhouse, representing both a municipal and a
 commercial use. In addition, it estimated that it would need
 7.59 acre-feet per year for irrigation, which it listed as a
 municipal use.

[6] Opposers have not challenged the
 in-house, irrigation, augmentation, or exchange uses to the
 extent that they were already covered by the augmentation
 plan as approved under the 2006 Decree. Nor have they
 challenged the addition of municipal or commercial uses to
 the extent that Independence's discovery responses
 detailed a specific plan with respect to those uses. They
 also have not challenged Independence's proposal to add a
 fire protection use. Accordingly, this case concerns only
 Independence's proposal to add domestic, industrial, and
 stock-watering uses to its existing augmentation plan, as
 well as any use of augmented water off the Subject
 Property.

[7] Our conclusion is consistent with
 proceedings that involve augmentation plans in the tributary
 context. For example, applicants for a conditional water
 right in tributary water that would injure senior
 appropriators may not receive a decree "except in
 conjunction with a plan for augmentation assuring enough
 available water to exercise the right." Fox v. Div.
 Eng'r for Water Div. 5, 810 P.2d 644, 645 (Colo.
1991). In those circumstances, applicants must comply with
 the antispeculation doctrine because they are seeking a
 conditional water right. E.g., City of
 Thornton, 926 P.2d at 30. In contrast, such applicants
 must secure approval of an augmentation plan to prevent
 injury that would otherwise result from exercising their
 conditional rights. See Lionelle v. Se. Colo. Water
 Conservancy Dist., 676 P.2d 1162, 1168 (Colo. 1984)
(holding that conditional water rights applicants could not
 receive a decree until they applied for an augmentation plan
 because exercising their proposed conditional water right
 would result in injury). Similarly, because augmentation plan
 applicants must show that their source of replacement water
 is "legally available," Empire Lodge, 39
 P.3d at 1150, applicants planning to use replacement water
 that is subject to the anti-speculation doctrine would have
 had to comply with that doctrine as part of applying for a
 determination of rights in the replacement water, see
Williams v. Midway Ranches Prop. Owners Ass'n, 938
 P.2d 515, 522 (Colo. 1997) (noting that replacement water may
 include "tributary native water which has been
 quantified by historic beneficial use"). Thus,
 antispeculation concerns underlying determinations of rights
 are separate and distinct from the injury concerns underlying
 augmentation plans associated with those rights.

[8] The sole distinction between
 augmentation plans for tributary water and augmentation plans
 for not-nontributary groundwater lies in how augmentation
 plan applicants determine the amount of replacement water
 they must provide. Tributary water users must determine, on a
 case-by-case basis, the amount of replacement water necessary
 to prevent injury. See Buffalo Park, 195 P.3d at
 684-85. Not-nontributary water users, on the other hand, must
 follow specific statutory requirements that determine the
 amount of replacement water they must make available based on
 (1) the aquifer from which the groundwater will be withdrawn,
 and (2) for some aquifers, the distance between the point of
 withdrawal and a contact with a natural stream. §
 37-90-137(9)(c.5)(I). All of Independence's potential
 not-nontributary wells would withdraw groundwater from the
 Upper Dawson aquifer, where "decrees approving plans for
 augmentation must provide for the replacement of actual
 out-of-priority depletions to the stream." §
 37-90-137(9)(c.5)(I)(B).

[9] Like augmentation plans, change
 applications are also subject to section 37-92-305(3)(a);
 thus, they "shall be approved" if the water court
 determines that the proposed change will not result in
 injury. Nevertheless, we have held that water courts must
 also apply the anti-speculation doctrine when reviewing an
 application for a change of water right. High
 Plains, 120 P.3d at 720-21; cf. Harvey W.
 Curtis et al., The Anti-Speculation Doctrine Extended to
 Change of Water Rights Cases: A New Dilemma for Water Rights
 Owners, 9 U. Denv. Water L. Rev. 577, 594-96 (2006)
(critiquing High Plains's deviation from the
 "straightforward, time-honored non-injury standard[]
 mandated by Colorado Revised Statute 37-92-305(3)").
Critically, however, change applications are distinct from
 augmentation plan applications because "[t]he essential
 function of the change proceeding is to confirm that a valid
 appropriation continues in effect under decree
 provisions that differ from those contained in the prior
 decree." High Plains, 120 P.3d at 719 (emphasis
 added). The statutory definition of an
 "appropriation" includes the requirement that an
 appropriation be non-speculative. § 37-92-103(3)(a).
Augmentation plans, in contrast, neither create nor alter
 appropriative water rights. See Buffalo Park, 195
 P.3d at 685-86. Therefore, they do not implicate the concerns
 that animated our extension of the anti-speculation doctrine
 to change applications in High Plains.

---------